UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| JORDAN LESEAN PAIGE, | ) | |
| Institutional ID No. 1251073, | ) | |
| SID No. 6688693, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 5:10-CV-00054-BG |
| LT. RUDOLFO SAUSEDA, JR., | ) | ECF |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

# **REPORT AND RECOMMENDATION**

## **Procedural Background**

Plaintiff Jordan LeSean Paige filed this civil rights action pursuant to 42 U.S.C. § 1983. Paige claims that Defendants, employees of the Texas Department of Criminal Justice (TDCJ), violated his constitutional rights during his confinement at the Preston E. Smith Unit (Smith Unit). Specifically, Paige claims that Defendants (1) used excessive force in violation of his Eighth Amendment rights on October 10, 2009, and (2) continuously harassed, threatened, and "hazed" him in retaliation for his pursuit of administrative and legal remedies for the October 10, 2009, incident. Paige names the following individuals as Defendants: Rudolfo Sauseda, Jr.; Ruben R. Rodriguez; Emiliano J. Gonzales; Richard Gary, Jr.; and Daniel Ramirez.

The United States District Court transferred the case to the United States Magistrate Judge for further proceedings. The undersigned held an evidentiary hearing on September 16, 2010, pursuant to *Spears v. McCotter*, 766 F.2d 179, 181-82 (5th Cir. 1985). After reviewing Paige's complaint, Paige's testimony under oath, and authenticated records from TDCJ, the court found that

Paige stated a claim sufficient to require an answer or other responsive pleading by Defendants. On January 12, 2011, the court ordered service of process as to Defendants.

Defendants filed an Answer and Jury Demand on February 14, 2011. In their Answer, Defendants denied Plaintiff's allegations and raised affirmative defenses of immunity and failure to exhaust administrative remedies. Defendants also asserted that Plaintiff's only requested relief – transfer to another TDCJ unit – was granted on January 31, 2011.

The undersigned provided the parties with an opportunity to consent to the jurisdiction of the United States Magistrate Judge. Paige consented to the jurisdiction of the United States Magistrate Judge in writing on September 20, 2010, but Defendants did not consent. Pursuant to the order of assignment, the undesigned now files this Report and Recommendation.

## **Findings of Fact**

Authenticated prison records reflect that prison officers used force against Paige in two separate incidents on October 10, 2009. In the first incident, officers used force while transporting Paige from his cell to the recreational area. In the second incident, officers used force against Paige inside his cell. Except for the foregoing facts, the evidence before the court contains conflicting versions of the events on October 10, 2009.

### I. Paige's Account of the First Incident

According to Paige's sworn testimony at the *Spears* hearing, the first incident started when Defendant Sauseda came to Paige's cell door and told him to stop talking so loudly to inmates in other cells across the run. Paige claims he covered the window in his cell door and walked away, causing other inmates to laugh at Sauseda. According to Paige, Defendant Gonzales escorted him out of his cell for a "major shake-down" later that day. Paige claims that Gonzales was in front of

Paige, and Sauseda was nearby to one side. Paige claims that he walked in front of Gonzales on the walkway about one cell away from his own. According to Paige, at that point, Gonzales swung at him while Defendant Ramirez brought him to the ground. Paige claims that officers continued to beat him for about two or three minutes while he was on his stomach on the floor in hand restraints. Paige testified that he was posing no threat "even if [he] was to be loud." Paige claims that the end of a video recording of the incident showed a few seconds of the officers beating him, but the officers later "redid" the incident for the camera to cover for it. Paige claims the "redone" film was recorded after the officers took him for medical treatment and before he was returned to his cell.

## II. Statements by Defendants Regarding the First Incident

Statements by Defendants in authenticated records provided by TDCJ describe their version of the first incident. In a signed statement dated October 10, 2009, Defendant Sauseda lists Defendants Gonzales and Ramirez as two of the four participants in the first incident. Sauseda lists himself and Defendant Rodriguez as witnesses to the first incident. According to Sauseda, officers used force because Paige "attempted to pull away from" two escorting officers "who then placed [Paige] on the floor." Sauseda claims that Ramirez and another officer relieved the two officers who had placed Paige on the floor after Rodriguez ordered Paige not to resist staff. According to Sauseda, officers then escorted Paige to the medical unit, where Paige declined medical treatment. In a signed statement from the same date, Rodriguez gives essentially the same account of this incident as Sauseda.

## III. Video and Photographic Evidence of the First Incident

TDCJ provided digital video allegedly showing portions of the first incident. The video depicts the following:

3

As the video starts, two officers are holding Paige face-down on the floor. Paige is in hand-restraints and is turned to face one of the officers holding him down. He and the officer exchange words. A narrator identifies the two officers as Officers Cortez and Gonzales. Two other officers, one of whom is identified as Officer Ramirez, relieve Cortez and Gonzales. As Paige is escorted down the walkway to the medical unit, he repeatedly threatens to sue. An officer tells Paige to "get off the noise" several times. Ramirez and another officer make Paige face the wall next to the door of the medical unit. Paige curses, calls them racist, and threatens to sue. An officer again tells Paige to "get off the noise." Paige then questions why the officers had to beat him up in handcuffs, calls them cowards, and continues to curse.

The escorting officers guide Paige to his knees, and a third officer places Paige in leg restraints. Paige continues his tirade and states that the officers are cowards because they jumped on him together while he was in handcuffs. He challenges the officers to fight him one-on-one. At least once Paige says, "Watch what I do when I catch you. . . . I'm going to kill you."

A nurse opens the door to the medical exam room. The officers tell Paige to stop resisting. Paige says several times, "I'm not resisting; I'm talking." The escorting officers raise Paige to his feet and take him into the exam room. Paige says to the nurse, "I want to stay like this." The nurse says, "Are you refusing treatment?" Paige says, "Yes, ma'am. Yes, ma'am." Paige then turns to the camera and states that he has been denied medical treatment. The nurse then states to the camera that Paige has refused medical treatment.

Paige continues his tirade while an officer takes photos of him and other officers take him back to his cell. At least once Paige says, "I will kill you and your kids." As the officers close Paige's cell door with Paige inside in hand-restraints, Paige spits on one of the officers. As the

4

officers remove Paige's hand restraints through a slot in the cell door, Paige continues his tirade and tries to pull the hand restraints into the cell.

TDCJ provided digital photos showing Paige after the first incident. These photos were taken during the above-described video recording of the first incident. The photos depict the following: Paige stands in a clean white jumpsuit flanked by two officers. He has lacerations and blood on his lips and gums. He also appears to have a bloody nose and a laceration on his big toe. He has two small marks on his face and very minor swelling under his right eye. One of the photos shows Paige's spit on an officer's sleeve. The spit is pink.

### IV. Paige's Account of the Second Incident

Paige claims the second incident began when he was taken for medical treatment after the first incident. According to Paige, he tried to tell the nurse about the bruises and swelling on his face from the beating, but she immediately turned around to tell the camera that Paige had declined medical attention after Defendant Sauseda whispered to her. At the *Spears* hearing, Paige admitted that he then had a "hostile verbal confrontation" with Sauseda in which he questioned why Sauseda had denied him medical attention. Paige testified that the confrontation did not contain threats but did include curse words.

Paige claims that after being returned to his cell, Defendants Gary and Rodriguez beat him a second time to "take their anger out on him" for Paige's confrontation with Sauseda and for the piece of footage showing the previous beating. Paige testified that at this second beating he was on his side and still in hand restraints. He claims he turned his head from left to right to avoid the strikes and therefore saw who was striking him. Paige testified that he lost consciousness during this incident because officers had placed their knees on the upper and lower part of his back. Paige

5

also testified that prior to October 10, 2009, he had never threatened, assaulted, or had any other problems with Defendants since he began his confinement at Smith Unit on June 14, 2005.

## V. Statements by Defendants Regarding the Second Incident

Statements by Defendants in authenticated records provided by TDCJ describe their version of the second incident. In a signed statement dated October 10, 2009, Defendant Gary states that the incident occurred when he and another officer were attempting to return Paige's cellmate to the cell they shared. According to Gary, he was holding Paige's right arm, and the other officer was holding Paige's left arm when Paige "jerked away" from the other officer and "kicked him in his left lower leg." Gary states that the other officer then placed Paige on the floor, and Gary "proceeded into the cell to assist" the other officer because Paige was resisting. Gary claims that he held Paige's right arm until additional staff arrived. Gary also states that he had applied hand restraints to Paige "before the use of force occurred."

In a signed statement from the same date, Defendant Rodriguez states that he "was called to A-wing due to an Officer assault." According to Rodriguez, he and another officer responded with a video camera, which Rodriguez ordered to be turned on after Paige kicked an escorting officer. Rodriguez states that the officer pushed Paige into the cell and placed him on the floor. According to Rodriguez, Defendant Gary assisted the officer "in securing Offender Paige inside the cell." Rodriguez states that other officers then escorted Paige out of the cell to be seen by a nurse "who cleared him noting no injuries as a result of the use of force." Rodriguez claims that he then took four digital photos of Paige and ordered him to get on his knees in the back of the cell and not to move. According to Rodriguez, Paige's cellmate was then returned to the cell without incident.

6

## VI. Video and Photographic Evidence of the Second Incident

TDCJ provided digital video showing portions of the second incident. The video depicts the following:

As the video starts, two officers are holding Paige on his stomach on the floor in his cell. A narrator identifies the officers as Officers Reyes and Gary. Two officers enter the cell and relieve Reyes and Gary. A third officer enters the cell. The third officer exits the cell, and Reyes and Gary assist Paige to his feet and out of the cell.

The same nurse from the video of the first incident approaches Paige and looks at his chest. The nurse turns to the camera and says, "No injuries noted due to use of force." The nurse leaves, and Paige mumbles inaudibly. An officer takes digital photos of Paige, and Reyes and Gary return Paige to his cell. While Paige is kneeling facing the back wall inside his cell in hand restraints, other officers return Paige's cellmate to the cell. The officers close the cell door and remove the hand restraints from both inmates without incident.

TDCJ provided digital photos showing Paige after the second incident. These photos were taken during the above-described video recording of the second incident. The photos depict the following:

Paige is wearing shorts, no shirt, and high-top sneakers. Paige has a large bruise and major swelling on the right side of his face. He has redness and bruising on his left shoulder and lacerations on his right elbow. He also has a laceration on his right knee. Paige has redness, bruising, and scratches on his middle and lower back. He has redness on his right shoulder blade.

## VII. Authenticated Records Regarding Paige's Medical Treatment

In a signed statement dated October 10, 2009, a nurse reported that Paige refused medical

treatment after the first incident. According to the statement, "a visual exam was done and no apparent injury noted." In another statement from the same date, the nurse reported that Paige was examined after the second incident and "no apparent injury was noted."

On a form dated October 13, 2009, a nurse recorded that Paige requested medical treatment for abrasions on his forehead, shoulder, knees, and elbow. According to the form, Paige stated that the injuries were from the use of force on October 10, 2009. The form directed Paige to clean superficial wounds with an antibiotic ointment and take two 200 mg tablets of ibuprofen for three days to relieve discomfort. The form also indicates that Paige was instructed on signs of infection such as swelling, drainage, redness, and heat.

## **Conclusions of Law**

### I. Preliminary Screening Standards

When a prisoner seeks redress from a government entity or officer, a court must dismiss the complaint before requiring responsive pleading if the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b); *see also* 28 U.S.C. § 1915(e)(2)(B). A complaint is frivolous if it lacks an arguable basis in law or in fact. *See Neitzke v. Williams*, 490 U.S. 319, 325-27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). A complaint fails to state a claim upon which relief may be granted if, assuming the plaintiff's allegations are true, "no relief could be granted under any set of facts that could be proven consistent with the allegations." *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998). The court notes that Paige has not requested monetary relief. The court is also satisfied that Paige's complaint is not malicious.

## II. Excessive Use of Force

To establish an Eighth Amendment violation for excessive use of force by a prison official, a plaintiff must show that the defendant(s) unnecessarily and wantonly inflicted pain. *See Whitley v. Albers*, 475 U.S. 312, 319-21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Whether force is unnecessary or wanton depends on whether it "was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (quoting *Whitley*, 475 U.S. at 320). Factors relevant to this determination include

> 1. the extent of the injury suffered;
>
> 2. the need for application of force;
>
> 3. the relationship between the need and the amount of force used;
>
> 4. the threat reasonably perceived by the responsible officials; and
>
> 5. any efforts made to temper the severity of a forceful response.

*Baldwin v. Stalder*, 137 F.3d 836, 838 (5th Cir. 1998).

The Court of Appeals for the Fifth Circuit applied these standards in *Valencia v. Wiggins*, 981 F.2d 1440 (5th Cir. 1993). In that case, Valencia, a pre-trial detainee, was ordered to exit his cell after causing a verbal disturbance. *Id.* at 1441-42. After Valencia refused to exit his cell, Wiggins, a jail deputy, hit Valencia's head against jail bars and applied a choke hold rendering Valencia temporarily unconscious. *Id.* at 1442-43. After Valencia regained consciousness, Wiggins took Valencia to a different cell and struck him at least three times while Valencia was handcuffed on his knees. *Id.* The court had "no difficulty finding that . . . Wiggins used force maliciously and sadistically to cause harm, not in a good-faith effort to maintain or restore discipline." *Id.* at 1447.

9

Like Valencia, Paige has alleged that Defendants beat him after he caused a verbal disturbance. *See id.* at 1441-42. Also like Valencia, Paige has alleged that Defendants punched and kicked him while he was on the floor in restraints and rendered him temporarily unconscious on one occasion. *See id.* at 1442-43. In view of these similarities, Paige has alleged facts that, if true, amount to a violation of his Eighth Amendment rights. To the extent that Paige alleges that Defendants retaliated against him for pursuing administrative and legal remedies for this potential constitutional violation, he also states a valid claim for relief under 42 U.S.C. § 1983. *See Woods v. Smith*, 1161, 1164 (5th Cir. 1995) ("The law of this circuit is clearly established . . . that a prison official may not retaliate against or harass an inmate for exercising the right of access to the courts, or for complaining to a supervisor about a guard's misconduct.").

Defendants' assertion that Paige's injuries "were *de minimis* and will not support a claim under 42 U.S.C. § 1983" is misplaced. The United States Supreme Court recently clarified that it is improper for a court to dismiss a prisoner's excessive force claim on the sole ground that the prisoner's injuries were *de minimis*. *See Wilkins v. Gaddy*, --- U.S. ----, 130 S.Ct. 1175, 175 L.Ed.2d 995 (2010). The Court reasoned that such a dismissal improperly bypasses the core inquiry of whether force was applied "maliciously and sadistically to cause harm." *Id.* at 1179 (quoting *Hudson*, 503 U.S. at 7). The Court also emphasized that the extent of an inmate's injury is simply one factor that "may suggest whether the use of force could plausibly have been thought necessary in a particular situation." *Id.* at 1178 (quoting *Hudson*, 503 U.S. at 9) (internal quotations omitted); *see also Baldwin*, 137 F.3d at 838 (listing "the extent of the injury suffered" as one of five factors relevant to an excessive force determination).

As the Court in *Wilkins* noted, the Court of Appeals for the Fifth Circuit has used conflicting

10

language regarding whether it is appropriate to dismiss an excessive force claim based solely on a finding of *de minimis* injury. *Id.* at 1179 n.2 (citing *Gomez v. Chandler*, 163 F.3d 921, 924 (5th Cir. 1999) and *Brown v. Lippard*, 472 F.3d 384, 386 (5th Cir. 2006)). However, as also noted by the Court in *Wilkins*, the Court of Appeals for the Fifth Circuit has held that injuries similar to those alleged by Paige are not *de minimis*. *Id.* For example, in *Gomez*, the court held that cuts, scrapes, and contusions to an inmate's face, head, and body were not *de minimis*. 163 F.3d at 925. In *Brown*, the court held that one-centimeter abrasions on an inmate's left knee and shoulder, pain in his right knee, and tenderness around his left thumb were "more than a *de minimis* injury[.]" 472 F.3d at 386 n.1. In *Gomez* and *Brown*, the court emphasized that the inmate requested and received medical treatment for his injuries. *Id.*; *Gomez*, 163 F.3d at 624.

Similar to *Gomez* and *Brown*, authenticated photographs provided by TDCJ show that Paige had lacerations and bruises on his face and body directly following the two incidents. Also like *Gomez* and *Brown*, authenticated records reflect that Paige requested and received medical treatment for his abrasions on October 13, 2009. Although a video recording shows Paige verbally refusing medical treatment from a prison nurse on October 10, 2009, Paige disputes the accuracy of that video, stating that it was "redone" after he received medical treatment. Furthermore, the nurse states in the video that Paige had no apparent injuries, in conflict with photographic evidence.

For the foregoing reasons, Paige's claims survived preliminary screening under 28 U.S.C. § 1915A.

### III. Exhaustion of Administrative Remedies

An inmate may not bring a claim under 42 U.S.C. § 1983 "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). TDCJ has a two-step inmate grievance

11

process. *See* Tex. Dep't of Crim. Justice, <u>Offender Orientation Handbook</u> 52-54 (2004), *available at* http://www.tdcj.state.tx.us/publications/cid/OffendOrientHbkNov04.pdf. An inmate "must pursue a grievance through both steps for it to be considered exhausted." *Johnson v. Johnson*, 385 F.3d 503, 515 (5th Cir. 2001). However, "prison officials' statements concerning administrative remedies can render such remedies unavailable." *Dillon v. Rogers*, 596 F.3d 260, 268 (5th Cir. 2010).

To exhaust administrative remedies for a particular claim, a grievance must give prison officials "fair opportunity under the circumstances to address the problem that will later form the basis of the suit[.]" *Johnson*, 385 F.3d at 522. However, an inmate need not present legal theories or identify defendants by name as long as the grievances can fairly be read to alert prison officials to the conduct that forms the basis of the inmate's claims. *See id.* at 517-23.

"Since exhaustion is a threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time, . . . judges may resolve factual disputes concerning exhaustion without the participation of a jury." *Dillon*, 596 F.3d at 272. "[W]hen courts rule on exhaustion on the basis of evidence beyond the pleadings, the nonmoving party should be granted the protections of Rule 56 [governing summary judgment]." *Id.* at 271. Defendants who raise the affirmative defense of failure to exhaust administrative remedies "must establish beyond peradventure all of the essential elements of the defense . . . to warrant summary judgment in their favor." *Id.* at 266. "If the plaintiff survives summary judgment on exhaustion, the judge may resolve disputed facts concerning exhaustion, holding an evidentiary hearing if necessary." *Id.* at 273. If a court concludes that an inmate has failed to exhaust available administrative remedies, the court may dismiss without prejudice and the applicable statute of limitation may be tolled. *See Wright v. Hollingsworth*, 260 F.3d 357, 359 (5th Cir. 2001).

In the instant case, authenticated prison records reflect that Paige filed a Step 1 Grievance dated October 10, 2009, and received by TDCJ on October 16, 2009. In this Grievance, Paige described the first incident and named Ramirez, Gonzales, Rodriguez, and Sauseda as participants. Paige also stated that he was in fear of retaliation by Smith Unit officers. TDCJ responded to this Grievance on October 29, 2009, and stated that Paige's Grievance was included in files being reviewed by TDCJ to investigate both incidents. The response also stated, "No further action by this office is warranted." Because TDCJ understood Paige's Step 1 Grievance to cover both incidents, the Grievance can fairly be read to alert prison officials to the conduct that forms the basis of Paige's claims. *See Johnson*, 385 F.3d at 517-23.

Paige attached to his complaint a Step 2 Grievance form dated November 2, 2009. On that form, Paige complained of continuing retaliation by Gonzales, Rodriguez, and Sauseda. However, the form is not stamped as having been received by TDCJ, and TDCJ's authenticated records do not contain the form. Paige asserts in his complaint that he exhausted both steps of the grievance procedure. Accordingly, a fact issue exists in connection with the Step 2 Grievance form.

According to authenticated records, Paige filed Step 1 Grievances complaining of "hazing" and harassment by Defendants Sauseda and Gary on January 5, 2010, and March 2, 2010, respectively. TDCJ's response to both Grievances stated that no action was warranted because sufficient evidence was not found to substantiate Paige's claims. Neither Paige nor TDCJ's authenticated records indicate that Step 2 Grievances were filed in connection with these responses.

Because Defendants bear the burden of proof and a factual dispute remains regarding exhaustion of administrative remedies, the case must proceed forward at this stage. *See Dillon*, 596

F.3d at 266.[1]

## IV. Eleventh Amendment Immunity

The Eleventh Amendment prohibits suits "brought against a state by one of its own citizens, as well as [suits] brought by a citizen of another state." *Ex parte Young*, 209 U.S. 123, 150, 28 S.Ct. 441, 52 L.Ed. 714 (1908). This prohibition "also protects state actors in their official capacities." *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010). However, the Eleventh Amendment "does not protect state officials from claims for prospective relief when it is alleged that the state officials acted in violation of federal law." *Warncock v. Pecos County*, 88 F.3d 341, 343 (5th Cir. 1996). To fall under this exception, "a suit must be brought against individual persons in their official capacities as agents of the state and the relief sought must be declaratory or injunctive in nature and prospective in effect." *Saltz v. Tenn. Dep't of Emp't Sec.*, 976 F.2d 966, 968 (5th Cir. 1992).

In the instant case, Paige requests prospective injunctive relief, namely permanent transfer to a different facility. Accordingly, to the extent Paige is suing Defendants in their official capacities for prospective injunctive relief, the Eleventh Amendment does not shield them from suit. *See Mayfield v. Tex. Dep't of Crim. Justice*, 529 F.3d 599, 604-06 (5th Cir. 2008).

---

[1] As referenced in TDCJ's response to Paige's Step 1 Grievance regarding use of force, TDCJ conducted a thorough investigation of both incidents, including the conduct of all Defendants named in Paige's complaint. TDCJ closed its investigation on January 13, 2010. In view of this investigation, the primary purposes of requiring inmates to exhaust administrative remedies – "fair opportunity . . . to address the problem that will later form the basis of the suit" by "prompt dispassionate investigation" – have been fulfilled. See *Johnson*, 385 F.3d at 522; *Wright*, 260 F.3d at 358. Although the Court of Appeals for the Fifth Circuit has held that substantial compliance with TDCJ's two-step grievance procedure is insufficient to satisfy section 1997e(a) – though never in a situation where the underlying purposes of that section have been so thoroughly fulfilled as in this case – that court has never considered whether the outcome of an investigation like the one in this case could render additional administrative remedies so speculative as to make them unavailable. *See Wright*, 260 F.3d at 358. Furthermore, estoppel may be relevant to the extent that Paige reasonably and detrimentally relied on TDCJ's reference to the investigation in the response to his Step 1 Grievance. *See Dillon*, 596 F.3d at 270.

## V. Qualified Immunity

"Qualified immunity is only applicable as a protective shield once a plaintiff has made out a claim against an official acting in his individual capacity." *Goodman v. Harris County*, 571 F.3d 388, 396 (5th Cir. 2009). After a defendant raises qualified immunity, "the plaintiff bears the burden of negating qualified immunity, but all inferences are drawn in his favor." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (internal citation omitted). To meet this burden, a plaintiff must overcome three hurdles. First, a plaintiff must allege facts that amount to a "violation of a constitutional right." *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009). Second, the constitutional right must be "clearly established" at the time of the defendant's alleged misconduct. *Id.* A constitutional right is clearly established if the contours of the right are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Brown v. Callahan*, 623 F.3d at 253. A plaintiff meets this standard if the unlawfulness of the officers' conduct is "readily apparent from relevant precedent in sufficiently similar situations." *Brown v. Miller*, 519 F.3d 231, 236-37 (5th Cir. 2008). Third, a plaintiff "must allege facts sufficient to demonstrate that no reasonable officer could have believed his actions were proper." *Brown v. Callahan*, 623 F.3d at 253. The objective reasonableness of an officer's conduct "must be measured with reference to the law as it existed at the time of the conduct in question." *Valencia v. Wiggins*, 981 F.2d 1440, 1448 (5th Cir. 1993).

In the instant case, Paige has alleged that Defendants punched and kicked him while he was on the floor in hand restraints, rendering him temporarily unconscious in the second incident. As previously described, these facts, if true, amount to a violation of his Eighth Amendment right to be free of cruel and unusual punishment. *See Valencia*, 981 F.2d at 1441-47. Furthermore, the

15

unlawfulness of the alleged conduct is readily apparent from relevant precedent in similar situations. *See id.*; *Brown v. Lippard*, 472 F.3d at 386 (upholding district court's denial of qualified immunity where defendant allegedly struck inmate in back, head, and shoulders while inmate was handcuffed and sitting). Finally, Paige has alleged facts that, if true, demonstrate that no reasonable officer could have believed the conduct was proper in view of the law as it existed at the time. *See Brown v. Lippard*, 472 F.3d at 386; *Valencia*, 981 F.2d at 1441-47.

Defendants deny Paige's account of both incidents. Because there are disputed issues of material fact relevant to Defendants' qualified immunity defense, the case should proceed forward at this stage. *See Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435-36 (5th Cir. 1993) ("Whether [the defendants] had an objectively reasonable basis [for their conduct] cannot be sorted out without settling on a coherent view of what happened in the first place.").

## VI. Availability of Injunctive Relief

A plaintiff seeking injunctive relief "must satisfy the court that relief is needed." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). To meet this standard, a plaintiff must demonstrate "that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *Id.* at 633. The inquiry is a question of fact within the discretion of the trial court, and affidavits can rebut a plaintiff's assertion of cognizable danger of recurrent violation. *Id.* at 633-36. For example, in *W.T. Grant*, the Supreme Court held that denial of injunctive relief was appropriate where the plaintiff "elected not to file any countervailing affidavits or amend its complaint and stated on oral argument that the truth of the defendants' affidavits was not questioned." *Id.* at 635-36. In *Herman v. Holiday*, 238 F.3d 660 (5th Cir. 2001), an inmate requested injunctive relief for jail conditions that

16

allegedly violated the Eighth Amendment. *Id.* at 662-63. After the defendants moved for summary judgment, the district court held that the inmate's transfer to another facility rendered his claims for injunctive relief moot. *Id.* at 633. The Court of Appeals for the Fifth Circuit affirmed the judgment of the district court and reasoned that the possibility of transfer back to the prior facility was "too speculative to warrant relief." *Id.* at 665.

Paige contests Defendants' assertion that TDCJ has already granted the injunctive relief he seeks. Paige states that he was transferred to a different unit for a mental health program lasting eighteen months at the request of his psychologist. Paige asserts that he will be "shipped back" to the Smith Unit after he completes the program. Unlike the defendants in *W.T. Grant* and *Herman*, Defendants in this case have filed neither affidavits nor motions for dismissal or summary judgment to rebut Paige's assertions. Accordingly, the case should proceed forward at this stage.

## Recommendation

For the foregoing reasons, the undersigned recommends that the District Court enter a scheduling order as to Paige's claims.

## Right to Object

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2010); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate

judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

    DATED:    July 7, 2011.

                                    NANCY M. KOENIG
                                    United States Magistrate Judge